IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

LINDA GALE CORTEZ                          CV 09-6155-MA

        Plaintiff,                       OPINION AND ORDER

v.

MICHAEL ASTRUE,
Commissioner of Social
Security,

        Defendant.


KATHRYN TASSINARI
MARK MANNING
HARDER, WELLS, BARON & MANNING, P.C.
474 Willamette, Suite 200
Eugene, OR 97401
(541) 686-1969

      Attorneys for Plaintiff


1 - OPINION AND ORDER

DWIGHT C. HOLTON
United States Attorney
ADRIAN L. BROWN
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1003

DAVID MORADO
Regional Chief Counsel
L. JAMALA EDWARDS
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-3749

        Attorneys for Defendant


MARSH, Judge.

        Plaintiff Linda Gale Cortez seeks judicial review of

the Commissioner's final decision denying her August 22, 2006,

applications for disability insurance benefits (DIB) under

Title II of the Social Security Act, 42 U.S.C. §§ 401-33,

and supplemental security income (SSI) under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381-83f.

        Plaintiff initially alleged she had been disabled since June

5, 2006, because of epilepsy, complications from a broken left

arm and foot, stuttering, a back injury, and dyslexia.  She

subsequently added sleeplessness, obesity, hypertension, and

memory loss to the list of her impairments that limit her ability

to work.  Plaintiff's claim was denied initially and on

reconsideration.  On February 18, 2009, the Administrative Law

2  - OPINION AND ORDER

Judge (ALJ) held an evidentiary hearing and on February 26, 2009, she issued a Notice of Decision that plaintiff is not disabled. On March 27, 2009, the Appeals Council denied plaintiff's request for review.  On April 9, 2009, however, the Appeals Council set aside its earlier decision in order to consider additional information, and after considering that information, again denied plaintiff's request for review.  The ALJ's decision, therefore, is the Commissioner's final decision for purposes of judicial review.[1]

Plaintiff seeks an Order reversing the Commissioner's final decision and remanding the case for the payment of benefits or, in the alternative, remanding the case for further proceedings. For the following reasons, I **AFFIRM** the final decision of the Commissioner and **DISMISS** this action with prejudice.

## THE ALJ'S FINDINGS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled.  Bowen v. Yuckert, 482 U.S.137, 140 (1987).  See also 20 C.F.R. § 416.920. Plaintiff bears the burden of proof at Steps One through Four. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  Each

_____

[1] The Appeals Council noted it had not considered medical evidence offered by plaintiff after the ALJ's February 26, 2009, decision and advised plaintiff she would need to reapply for DIB and/or SSI for any disability claim arising after February 26, 2009.

step is potentially dispositive.

At Step One, the ALJ found plaintiff has not engaged in substantial gainful activity since the alleged onset of her disability on June 5, 2006.

At Step Two, the ALJ found plaintiff suffers from severe impairments of seizure disorder, obesity, and anxiety disorder. See 20 C.F.R. §§ 404.1520(c) and 416.920(c)(an impairment or combination of impairments is severe if it significantly limits an individual's physical or mental ability to do basic work activities).

At Step Three, the ALJ found plaintiff's impairments do not meet or equal a listed impairment. Plaintiff has the residual functional capacity (RFC) to perform light work that includes lifting 20 lbs occasionally and 10 lbs frequently, sitting or standing at will, performing simple 1- to 2-step tasks without public contact, and avoiding even moderate exposure to hazards.

At Step Four, the ALJ found plaintiff is unable to perform her past relevant jobs as a home attendant, housekeeper/cleaner.

At Step Five, the ALJ found plaintiff is able to perform light work in representative jobs such as assembler of small products, products, or electronics.

Consistent with these findings, the ALJ found plaintiff is not disabled and is not entitled either to DIB or SSI.

4  - OPINION AND ORDER

## LEGAL STANDARDS

The initial burden of proof rests on the claimant to establish disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  To meet this burden, the claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C § 423(d)(1)(A).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The court must weigh all of the evidence both supporting or detracting from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

The Commissioner bears the burden of developing the record.  DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).  The duty

to further develop the record, however, is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. <u>Mayes v. Massanari</u>, 276 F.3d 453, 459-60 (9th Cir. 2001).

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1178 (9th Cir.), <u>cert</u>. <u>denied</u>, 121 S. Ct. 628 (2000). "If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." <u>Lewin v. Schweiker</u>, 654 F.2d 631, 635 (9th Cir. 1981).

<u>**ISSUES ON REVIEW**</u>

Plaintiff asserts the ALJ (1) failed to give clear and convincing reasons for rejecting plaintiff's testimony, (2) did not adequately consider the medical opinion of examining physician, Kurt Brewster, M.D., regarding plaintiff's physical limitations, (3) did not adequately assess plaintiff's arm, back, and ankle pain, (4) did not adequately consider lay evidence of plaintiff's father, (5) erred in finding plaintiff is able to perform "other work" in the national economy, and (6) did not adequately explore the impact of plaintiff's mental impairments on her ability to work. Accordingly, Plaintiff contends the Commissioner's final decision should be remanded for an immediate payment of benefits or for further development of the record.

<u>**RELEVANT RECORD**</u>

<u>**Plaintiff's Evidence**</u>.

Plaintiff's evidence is derived from her disability report, hearing testimony, and work history report.

**a.  Education/Work History.**

Plaintiff was 51 years old on the date of the hearing.  She left high school during the 11th grade because she flunked tests and had a hard time in school.

She worked as a caregiver in nursing homes and homes generally from 1989 to 2006.  She also worked as a housekeeper and general laborer from 1991 to 1993 and in 1997.  In the past 10 years her earnings ranged from a high of approximately $16,000 in 2000 to a low of approximately $6,200 in 2005, the year before the alleged onset of her disability.

Plaintiff left her last job because of leg and arm pain.

**b.  <u>Plaintiff's Impairments/Residual Functional Capacity</u>.**

The only pain medication plaintiff takes is Tylenol for her ankle.  Her pain level on a 1-10 scale is 6 without the medication and 3 with it.

Plaintiff testified as follows in response to a question as to the maximum amount of weight she is able to lift:  "I've never even really, maybe 50, 60."  In response to a question as to the weight she could frequently lift during the day, she testified

"probably 70 to 80."  She also testified that she was "often"
able to lift "50."  The ALJ did not seek clarification as to what
weights those numbers represented.  Plaintiff later clarified
that they represented the weights of the people she was required
to lift in her job as a care-giver.

Plaintiff is able to sit for an hour before getting up and
stretching because her left hip hurts.  She is able to walk for
1/2 hour before her leg swells, starts to hurt, and goes numb.
Based on the advice of her doctor, she spends about an hour three
times a day lying down to avoid the swelling.

Plaintiff has difficulty using her left hand to grip or pick
up objects since she fractured her left forearm.  She is right
handed.

Plaintiff has epilepsy.  She is prescribed Dilantin, which
she takes three times a day to avoid seizures.  She does not know
she is having a seizure unless she is told so by the people
around her.  If she is alone, the only way she can know is if she
bites the side of her mouth or tongue.  Her last seizure was a
petit mal two months before the hearing.  She does not remember
the last seizure she had before then.  She has no idea how long
the seizures last.  Usually, after either a petit mal or grand
mal seizure, she feels "different," has a "hard time paying
attention," is "really tired," and feels "foggy" until at least
the next day.  The grand mal seizures are the worst.

8  - OPINION AND ORDER

The dosage amount of Dilantin she takes to control the seizures had recently been increased.

Plaintiff continues to drive.  She had a seizure while driving 3-4 years ago.  Although she continues to drive, she no longer thinks it is safe because the seizures are getting worse and are occurring more often.  Her treatment provider at the White Bird Clinic is aware of the seizures.

Plaintiff left her last employment as a caretaker because pain in her left arm made it difficult for her to lift patients, causing her concern that she would drop them.

In her last cleaning job, plaintiff had difficulty staying on her feet because of leg pain as well as pain in her arm.  In that job, she was required to move furniture to vacuum, wash pots and pans, and dust.  Although she is right-handed, she does a lot of lifting using her left hand.  Plaintiff is only able to lift objects up to 10 lbs.  As an example, she has difficulty lifting cast iron skillets.  She now avoids lifting furniture and the vacuum cleaner.

Plaintiff sleeps off and on approximately four hours a night.  Her memory has always been poor, but it did not prevent her performing her care-giver jobs because the tasks were repetitive.  She stutters when she is under stress.

**<u>Lay Witness Evidence</u>**.

Plaintiff's father, Reuben Cortez, sees her almost every day.  He described her daily activities as including showering, taking medications, doing housework, watching television, and visiting family.  He described plaintiff's prior work as a certified nurse's assistant working with the elderly or disabled.

Plaintiff has no difficulty with personal care.  However, she needs to be reminded repeatedly to take her medications. She has weakness in her arms and legs and is only able to stand for a short period of time.  She is able to cook small meals for herself.  She cleans her house and does the laundry, although she now takes longer to do everything because she needs frequent rest breaks.  She has difficulty sleeping.

Plaintiff shops twice weekly as long as her legs allow.

Plaintiff's hobbies, when she is able, include reading, watching television, sewing, and playing cards.  Plaintiff's inability to stand or walk for as long as she used to, and her weakness in her left arm, "sometimes prevent[] activity." Plaintiff no longer likes to go out in public.

Plaintiff cannot lift as much weight, walk as far, or climb as many stairs as she did in the past.  She has trouble standing and reaching.  She stutters, slurs her speech and has poor memory and concentration.

The warning signs when plaintiff is about to have a seizure include repeatedly looking over her right shoulder, biting her tongue, glazed eyes, extreme drooling, slight shaking of the head, and moaning. After a seizure, plaintiff has a headache, is tired and achy, and sleeps for several hours.

Three or fours years ago, plaintiff had a seizure which her father did not witness. He was called by the police, however, after plaintiff drove her car off the road.

**Medical Treatment Evidence.**

**a. Robert Tearse, M.D. - Neurologist.**

In March 1995, plaintiff complained of prominent headaches, which began when plaintiff was a teenager but recently flared up. Dr. Tearse had examined plaintiff 17 months earlier for similar complaints and recommended an electroencephologram, which, for reasons not stated, was not done. Plaintiff described a history of epilepsy based on nocturnal seizures in 1984. At that time, she was prescribed Dilantin but stopped taking the medication because it made her groggy. She had not had any seizures since then. Dr. Tearse thought the headaches suggested a "mixed tension and vascular process but might be due to atypical seizures or vestibulopathy (dizziness, vertigo).

In October 1997, plaintiff complaining of feeling dizzy for five minutes with severe spinning, as if she was drunk. She had migraine headaches with irregular frequency. Earlier EEGs showed

11 - OPINION AND ORDER

"equivocal minor abnormalities without obvious seizure patterns." Dr. Tearse thought plaintiff "might have a progressive inner ear problem."

In April 1998, plaintiff had a seizure while riding as a passenger in a car.  She then began worrying about driving.  She was prescribed Depakote to treat the seizures.

In May 1998, plaintiff complained of migraines, nausea, fatigue, and weakness.  Later that month, she reported she had not had any seizures in the last month but she continued to have headaches.

In May 1999, plaintiff had a seizure while driving.  Her medication was switched to Dilantin.

In July 1999, plaintiff reported migraine headaches, a recent flareup of seizures, frequent stuttering, and irregular speech.

In August 2000 and March 2001, plaintiff reported she had not had any seizures since May 1999, and requested that Department of Motor Vehicles forms be completed.

In April 2002, plaintiff reported a single seizure in July 2001.  Her epilepsy was under satisfactory control on Dilantin.

**b.  Sacred Heart Medical Center.**

In April 1998, plaintiff was treated at the Emergency Room after having a seizure while riding home with a friend after a social event.  When medics arrived, plaintiff was unresponsive, but later became sufficiently combative to require restraints.

12 - OPINION AND ORDER

She was confused and disoriented.  Plaintiff was given Dilantin, although it was unclear whether she suffered seizure.

In May 2004, plaintiff was again treated at the Emergency Room for a seizure that occurred while she was riding in the back seat of a car.  At the hospital, plaintiff stated she thought she had missed taking a Dilantin dose the night before.  Plaintiff's function quickly returned to normal while she was at the hospital.

In July 2005, plaintiff had a seizure while at work cleaning a house.  She had again missed some doses of Dilantin and admitted she was not compliant in taking her medication.

### c.  Junction City Clinic.

In November 2004, plaintiff called the clinic to report she had a seizure.  She was urged to go to Urgent Care to have her Dilantin level checked.

In July 2005, plaintiff was examined after her visit to Sacred Heart's Emergency Room following a seizure.  She had a significant contusion with pain in the shoulder area.  She reported that she fallen and sustained a contusion to the right shoulder and a sprain injury to the left ankle, both of which were "substantially improved."

Later that month plaintiff was treated for pain across her right breast and in her mid-back following an automobile accident.

In August 2005, plaintiff was treated for continuing pain across her right breast and in the mid-right side of her back

13 - OPINION AND ORDER

since the automobile accident.  Five days later, plaintiff
returned complaining of intense pain and discomfort in her mid-
lower back.  She was tender to palpation in the mid-thoracic and
lumbar area and diagnosed with a thoracic and lumbar strain
arising from the automobile accident, which was exacerbated by her
cleaning job, which involved climbing stairs, doing four sink
loads of dishes, moving heavy trash bags, and being on her feet
for at least two hours at a time.

    In mid-August 2005, plaintiff still had back pain when she
sat or stood for more than one hour.  She had no pain twisting.
Her low back and neck pain was exacerbated during an automobile
ride to Portland, but it did not radiate into her arms or legs.

**d. Becky Rainwater Physical Therapy.**

    In August-September 2005, plaintiff attended six physical
therapy sessions to treat pain symptoms arising from a
lumbar/thoracic strain.  At the outset, plaintiff's pain level was
at 5 on a scale of 1-10.  In the middle of the therapy period,
plaintiff "may have had a seizure or slept wrong."  Her low back
pain, however, had decreased to 3-4 and her thoracic back pain had
decreased to 3.  At discharge, plaintiff's pain symptoms were at
0-1, although she continued to have difficulty lifting heavy
objects.

14 - OPINION AND ORDER

**e.  White Bird Clinic - James Newhall, M.D.**

In March 2006, plaintiff was examined by Dr. Newhall.  She had run out of Dilantin.  She reported that she stuttered shortly before she experienced seizures.  During the examination, she had a headache, was stuttering and had chest pain and dizziness.

In August 2006, plaintiff complained of low back pain that lasted for three days.  A low back x-ray did not show any remarkable findings.

In February 2007, Dr. Newhall opined in response to a "seizure questionnaire" that plaintiff suffers "generalized tonic clonic seizures," i.e., grand mal seizures of the whole body, about 3-4 times a year with associated features of aura, falls, loss of consciousness, and stuttering.  The seizures are "sub-optimally controlled" because of "sub-optimal patient compliance."

**Medical Examination Evidence -  Kurt Brewster, M.D. - Internist.**

In April 2007, Dr. Brewster examined plaintiff on behalf of Disability Determination Services to evaluate her history of back pain, left arm fracture, epilepsy, and sleep problems.  As part of the examination, Dr. Brewster reviewed treatment notes and a shoulder x-ray taken at the Junction City Clinic in 2005.  He noted plaintiff was cooperative and her effort was satisfactory, but she was vague on details.

Plaintiff was anxious at the beginning of the examination, and she exhibited a gagging reflex that she attributed to her anxiety.  Her affect, however, was appropriate.  Dr. Brewster specifically noted the sparcity of medical records.  He found no anatomical reason, such as sleep apnea, to account for plaintiff's alleged sleep disorder.

Dr. Brewster noted that plaintiff "evidently had casting and pinning of the proximal ulna."  He recommended x-rays to determine whether there was "evidence of non-union or deformity within joint," and "a chance of post-fracture deformity."  He also noted plaintiff had "consistent" but "unexplained" loss of range of motion.

Based on his examination alone, without the benefit of x-rays, Dr. Brewster found plaintiff had (1) consistent changes in gait of unknown cause, (2) potential left arm degenerative changes or misalignment, and (3) some flexion deformities which may indicate denervation.

Dr. Brewster concluded plaintiff's residual functional capacity included the ability to walk or stand for six hours in an 8-hour workday, sitting without restriction, lifting a maximum of 20 lbs occasionally and 10 lbs frequently, and occasional restrictions in reaching, grasping, and pulling, as well as climbing, crawling, and balancing.

**Medical Consultation Evidence**.

**Martin Kehrli, M.D.**
**Hugh McMahon, M.D.**

In October 2006, Dr. Kehrli reviewed plaintiff's medical records on behalf of DDS and opined that plaintiff's only limitation in the workplace was to avoid moderate exposure to hazards such as machinery and heights.  He found her testimony and reporting of her impairments was only partially credible, because "[e]xam findings and reports of function are not fully congruent with the alleged limitations."

Dr. McMahon concurred in Dr. Kehrli's assessment.

**Linda Jensen, M.D.**

In May 2007, Dr. Jensen also reviewed plaintiff's medical records and opined plaintiff's objective findings did not support her alleged level of disability.  She concluded that plaintiff has the residual functional capacity to lift 20 lbs occasionally and 10 lbs frequently, stand/walk/sit for six hours in an eight-hour workday, and has unlimited push/pull ability.  Plaintiff is also able to balance frequently, and climb ramps/stairs, kneel, crouch, and crawl occasionally.  Based on plaintiff's history of seizures, Dr. Jensen recommended that she should never climb a rope, scaffold, or ladder, and should avoid moderate exposure to machinery and heights.

**Psychological Evaluation Evidence.**

**Alison Prescott, Ph.D.**

In May 2007, Dr. Prescott conducted a psychological evaluation of plaintiff. Plaintiff was oriented and cooperated with the evaluation. Her speech was halting, stuttering, and circumstantial (i.e., inclusion of trivial details). Her affect was within "normal limits" and she did not appear depressed. She appeared to be "genuinely anxious."

Dr. Prescott diagnosed a generalized anxiety disorder, epilepsy, and chronic pain. Plaintiff exhibited short term memory and concentration impairments, had "low average or borderline intellectual functioning," with "fairly good social functioning" but "low coping skills."

**Psychological Consultation Evidence.**

**Dorothy Anderson, Ph.D.**

In May 2007, Dr. Anderson reviewed plaintiff's medical records and opined that, because of her anxiety, plaintiff was moderately limited in her ability to understand and carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. Plaintiff was moderately restricted in her activities of daily living,

social functioning, and concentration, persistence, or pace.

**ANALYSIS**

**1.    Rejection of Plaintiff's Evidence**.

Plaintiff contends the ALJ did not give clear and convincing reasons for not crediting her testimony regarding the severity of her pain in her left arm, left ankle, and low back.

A claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged. . . .'" Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (quoting 42 U.S.C. § 423(d)(5)(A) (1988)). See also Cotton v. Bowen, 799 F.2d 1403, 1407-08 (9th Cir. 1986). The claimant need not produce objective medical evidence of the symptoms or their severity. Smolen v. Chater, 80 F.3d 1276, 1281-82 (9th Cir. 1996).

If the claimant produces objective evidence that underlying impairments could cause the pain complained of and there is no affirmative evidence to suggest the claimant is malingering, the ALJ is required to give clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of her symptoms. Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). See also Smolen, 80 F.3d at 1283. To determine whether the claimant's subjective testimony is credible, the ALJ may rely on

19 - OPINION AND ORDER

(1) ordinary techniques of credibility evaluation such as the
claimant's reputation for lying, prior inconsistent statements
concerning the symptoms, and other testimony by the claimant that
appears less than candid; (2) an unexplained or inadequately
explained failure to seek treatment or to follow a prescribed
course of treatment; and (3) the claimant's daily activities.  Id.
at 1284 (citations omitted).

Here there is no evidence of malingering.  The ALJ, however,
found there was no objective medical evidence to support
plaintiff's subjective complaints regarding the severity of her
left arm, left ankle pain, and low back pain.  Accordingly, the
ALJ found plaintiff's testimony as to the intensity, persistence,
and limiting effects of her pain symptoms was not credible "to the
extent they are inconsistent with the residual functional capacity
assessment."

Plaintiff contends the ALJ erred in discrediting her pain
testimony based solely on the absence of objective medical
evidence, "i.e. evidence obtained from the application of
medically acceptable clinical and laboratory diagnostic
techniques."  See Rollins v. Massanari, 261 F.3d 853, 856-857:

> [O]nce a claimant produces objective medical
> evidence of an underlying impairment, an [ALJ]
> may not reject a claimant's subjective
> complaints based solely on a lack of objective
> medical evidence to fully corroborate the
> alleged severity of pain.

20 - OPINION AND ORDER

Nevertheless, "the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." Id. See also 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2).

Here, the ALJ gave "great weight" to Dr. Brewster's opinion that plaintiff could perform light work "because it was based on personal observation." Dr. Brewster's observations, particularly as to plaintiff's alleged left arm impairments, were without the benefit of objective medical evidence, such as x-rays, and he recommended they be obtained. The subsequent MRI, however, revealed only a "mild narrowing of the left radial carpal joint without evidence of acute fracture." Likewise, an x-ray of the left ankle revealed only a "mild narrowing of the lateral ankle mortise" and "no focal soft tissue swelling." The ALJ also noted that Dr. Brewster's examination of plaintiff's lumbar spine revealed no range of motion deficit and x-rays were within normal limits. Finally, the ALJ noted Dr. Brewster's observation that plaintiff "demonstrated no loss of motor strength in her upper extremities, and was able to button her own shirt and tie her shoes. [She] was seen to roll up her sleeves equally with both arms." Finally, that ALJ also noted that plaintiff "takes only over-the-counter Tylenol for her pain."

On this record, I conclude the ALJ gave clear and convincing reasons for not entirely crediting plaintiff's testimony regarding the severity of her pain relating to her left arm, back, low back, and left ankle impairments.

**2.    Dr. Brewster's Medical Opinion.**

Plaintiff contends that the ALJ did not adequately consider and address Dr. Brewster's opinion that plaintiff had occasional restrictions in reaching, grasping, and pulling in his finding as to plaintiff's limitations.  I disagree.

As set forth above, the ALJ addressed Dr. Brewster's report of his examination of plaintiff at length.  Dr. Brewster found manipulative limitations in the absence of x-rays.  He recommended an x-ray be obtained.  In response to the recommendation, a subsequent MRI revealed only a "mild narrowing of the left radial carpal joint without evidence of acute fracture."

On this record, I conclude the ALJ adequately considered Dr. Brewster's medical opinion.

**3.    Assessment of Plaintiff's Arm, Back, and Ankle Pain.**

For the reasons stated above, I conclude the ALJ did not err in his assessment of the severity of plaintiff's arm, back, and ankle pain.

**4.    Lay Evidence of Plaintiff's Father.**

Lay witness evidence regarding a claimant's symptoms "is competent evidence that an ALJ must take into account" unless he

"expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001).

Plaintiff's father stated that plaintiff needed reminders and patience in regard to taking her medications.  This evidence is probative as to plaintiff's epilepsy because the medical records reflect she was often non-compliant in taking Dilantin, which was prescribed to help control her seizures.

The ALJ addressed the father's evidence that plaintiff "does not like to go out in public very often" and "her muscle strength, memory, and concentration are limited by her impairments."  The ALJ accepted this evidence as to the father's perceptions, but concluded the evidence was insufficient to alter the ALJ's finding as to plaintiff's residual functional capacity.

On this record, I conclude the ALJ adequately accounted for the lay evidence.  Although the ALJ did not specifically refer to the father's observation that plaintiff needed to be reminded to take her medications, the ALJ adequately addressed the father's statement as to plaintiff's limited memory and concentration and, particularly, the need to remind plaintiff to take her medication.

**5.  Evaluation of Plaintiff's Residual Functional Capacity.**

Plaintiff contends the ALJ failed to consider all of plaintiff's physical and psychological impairments in determining her residual functional capacity.  For the reasons, stated above,

23 - OPINION AND ORDER

I disagree.  I find the ALJ adequately addressed plaintiff's physical impairments and her residual functional capacity in light of those impairments.

**6.   Evaluation of Plaintiff's Psychological Impairments.**

The ALJ addressed Dr. Prescott's report of her psychological examination of plaintiff and Dr. Anderson's evaluation of the results of Dr. Prescott's examination.  The ALJ found plaintiff's difficulties with memory and concentration limited her to work involving simple one-two steps.

I conclude the ALJ's finding as to the impact of plaintiff's psychological limitations on her ability to work is supported by the record as a whole.  Moreover, in reviewing the record as a whole, I find no useful purpose would be served by any further development of that record.

<u>CONCLUSION</u>

Accordingly, for all the reasons set forth above, the Commissioner's final decision denying benefits to plaintiff is **AFFIRMED**, and this matter is **DISMISSED** with prejudice.

IT IS SO ORDERED.

DATED this 12 day of May, 2010.


    /s/  Malcolm F. Marsh
MALCOLM F. MARSH
United States District Judge


24 - OPINION AND ORDER